**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

BRENDA L. HILL MYRICK,
ADMINISTRATOR OF THE ESTATE OF
GREGORY HILL ALSO KNOWN AS GREGORY LEE HILL,
DECEASED,

      Plaintiff,

                              Case: 3:16-cv-952-JAG

v.

                              **JURY TRIAL DEMANDED**

NAPHCARE, INC.,

      <u>Serve</u>:

      RALS VA, LLC (Registered Agent)
      7288 Hanover Green Drive
      Mechanicsville, VA  23111

KHAIRUL EMRAN, MD,
DONNA PIERCE, RN,
ANGELA PATTERSON, RN,
MARCELLA PASCAL, RN, BSN,
BEVERLY DANIELS, LPN,
KELSEY GREEN,
NAPHCARE JOHN DOE DEFENDANTS 1-5 (NaphCare
      Employees/Agents working at the Richmond City Justice
      Center in January 2016)

      <u>Serve all at:</u>

      RALS VA, LLC (Registered Agent)
      7288 Hanover Green Drive
      Mechanicsville, VA  23111

C.T. WOODY, JR., (Sheriff, City of Richmond, Virginia),
CAPTAIN JOHNSON,
DEPUTY McCLOUD,
SERGEANT O'RARA ALSO KNOWN AS SERGEANT O'ROARK,
LT. FELIX,
DEPUTY EVERETT,
DEPUTY JOHN DOE DEFENDANTS 1-5 (Deputies of Defendant
      C. T. Woody, Jr., Sheriff, City of Richmond, employed at
      the Richmond City Justice Center in January 2016)

<u>Serve all at</u>:

1701 Fairfield Way
Richmond, VA  23223
(City of Richmond),

      Defendants.

## **<u>COMPLAINT</u>**

COMES NOW Plaintiff Brenda L. Hill Myrick, Administrator of the Estate of Gregory

Hill, Also Known As Gregory Lee Hill, deceased (Plaintiff's decedent is referred to herein as

"Mr. Hill"), by counsel, and moves this Court for judgment against NaphCare, Inc.

("NaphCare"); Khairul Emran, MD; Donna Pierce, RN; Angela Patterson, RN; Marcella Pascal,

RN, BSN; Beverly Daniels, LPN; Kelsey Green; NaphCare John Doe Defendants 1-5 (NaphCare

Employees/Agents working at the Richmond City Justice Center in January 2016) (all of the

foregoing are sometimes collectively referred to herein as the "NaphCare Defendants"); C.T.

Woody, Jr. ("Woody"); Captain Johnson; Deputy McCloud; Sergeant O'Rara Also Known As

Sergeant O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5[1] (Deputies to

Defendant C. T. Woody, Jr., Sheriff, City of Richmond, employed at the Richmond City Justice

Center in January 2016) (Defendant Woody and the Deputy Defendants listed above are

sometimes collectively referred to herein as the "Sheriff's Office Defendants"), and, in support

of her Complaint, states as follows:

---

[1] Relevant documents obtained by the Plaintiff pursuant to a state FOIA request do not list the full names of the Sheriff's Office Defendants.  As noted below, Defendants Captain Johnson; Deputy McCloud; Sergeant O'Rara Also Known As Sergeant O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants are sued in their "individual" capacity.  Titles are used herein solely to *identify* individual Defendants, as Plaintiff does not know their first names.

## I.      INTRODUCTION

1.      On January 9, 2016, at 7:02 p.m., EMS personnel summoned to the Richmond City Justice Center (the "Jail") found 26-year-old detainee Mr. Hill on the ground next to a "restraint chair."  Mr. Hill was not breathing spontaneously and had no pulse.  He had blood in his nose and "blood shot eyes."  EMS personnel commenced resuscitation and then transported Mr. Hill to VCU Medical Center, where he was shortly afterwards pronounced dead.

2.      Four days earlier, on January 5, 2016, Mr. Hill was arrested in Petersburg, Virginia.  On the next day, January 6, 2016, Mr. Hill was transferred to the Jail.  He was listed on the Transfer Form as chronically suffering from hypertension (high blood pressure).  Mr. Hill informed Defendant NaphCare and its employees that he took 3-4 Xanax daily (Xanax is an anti-anxiety medication and is in a class of drugs referred to as a "benzodiazepines"), and that he was at risk of, or was experiencing, withdrawal from the medication.  Benzodiazepine withdrawal is a very serious condition that requires specific treatment and monitoring; it is potentially deadly.  However, Defendant NaphCare and its Defendant employees recorded Mr. Hill as being at risk of suffering from *opiate* withdrawal, not benzodiazepine withdrawal.  On multiple occasions, NaphCare Defendants disregarded the fact that Mr. Hill was not being treated for benzodiazepine withdrawal, despite documenting in and reviewing Mr. Hill's medical records.

3.      On the afternoon of January 9, 2016, Jail records indicate that Mr. Hill became medically distressed – upon information and belief, as a result of the NaphCare Defendants' failure to treat Mr. Hill for benzodiazepine withdrawal.  The Sheriff's Office Defendants did not immediately seek medical help for Mr. Hill, but physically restrained and pepper sprayed Mr. Hill.  They only thereafter decided to take Mr. Hill to the Medical Department to be assessed.

NaphCare personnel determined that Mr. Hill needed to be taken to the hospital; NaphCare nurses directed the deputies to do so.

4.      However, the Sheriff's Office Defendants deliberately disregarded the directive. Rather than taking Mr. Hill to the hospital, they took him to the 1st floor of the Jail and strapped him into an "Emergency Restraint Chair" – Mr. Hill's feet, arms, and chest were pulled tightly against the chair.  Jail procedures make clear that Emergency Restraint Chairs are to be used "only in extreme instances and only when other types of restraints have proven ineffective."  The NaphCare Defendants, for their part, apparently watched the Sheriff's Office Defendants simply leave the Medical Department with Mr. Hill, who they believed to be emergently ill; they did not seek to accompany the Sheriff's Office Defendants and Mr. Hill, did not call EMS, and apparently did not proactively follow up at all until later contacted by the Sheriff's Office Defendants.

5.      Jail records indicate that at 1840 (6:40 pm), "Deputy staff called medical deputy asking if pt. can be assessed by staff."  Records indicate that at 1843 (6:43 pm), Medical staff "arrived to [pod] 1D to "assess pt.  Deputy staff were securing pt. in restraint chair."  NaphCare medical staff, upon information and belief, were surprised and upset to see Mr. Hill in a restraint chair.  The medical staff determined to obtain input from their supervisors concerning the circumstances.   However, before they reached the elevator, the Sheriff's Office Defendants summoned them back to Mr. Hill asserting that he had become unresponsive.

6.      At 1848, NaphCare personnel noted Mr. Hill to be "unresponsive to name [and] sternal rub.  No palpable pulse, pupils were fixed and respirations ceased.  [No] signs of life."  Two minutes after recognizing such (at 1850), NaphCare personnel "initiated" CPR "while pt. was in restraint chair."  Jail records indicate that restraints were finally "released by deputy staff

[and] pt. was lowered to the ground where CPR continued." ***Five* minutes later** (at 1855), 911 was finally "called and AED placed on pt. [No] shock advised. CPR continued." When EMS arrived at the scene, it initiated, temporarily ceased, and then reinitiated CPR. EMS transported Mr. Hill to the VCU Emergency Department. 26-year-old Mr. Hill was pronounced dead at 7:50 pm shortly after arriving at the VCU Emergency Department.

7.      Following Mr. Hill's death, Sheriff Woody declined to meet with or provide anything other than Mr. Hill's NaphCare records to Mr. Hill's family. The written rationale for placing Mr. Hill in the restraint chair – which is required to be documented – has never been provided to the family. The Richmond Police Department ("RPD") has instituted a criminal investigation into Mr. Hill's death. Sheriff Woody has stunningly stonewalled the RPD's death investigation. The Medical Examiner report concerning Mr. Hill states, "**Limited** reports and video surveillance footage were provided by the jail **despite multiple requests from the local police department.**" (Emphasis added.) Further, Sheriff Woody apparently told the RPD that certain relevant video taken on the 6th floor of the Jail was destroyed. Defendants Sheriff Woody and/or NaphCare opted not to provide relevant medical records to the Office of the Chief Medical Examiner, thereby impeding the Medical Examiner's investigation. Mr. Hill's cause of death is stated as "unknown causes."

## II.      <u>JURISDICTION</u>

8.      Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343. Additionally, jurisdiction exists pursuant to 28 U.S.C. § 1332, as the matter in controversy: a) exceeds the sum or value of $75,000, exclusive of interest and costs, and b) is between citizens of different States, as the Plaintiff is a citizen of the Commonwealth of Virginia and Defendant NaphCare is a

citizen of Alabama.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§

1367 (a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50

*et seq.* (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.*

(survival statute).  All relief available under the foregoing statutes is sought herein by Plaintiff.

## III.  **VENUE**

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the

acts and omissions giving rise to Plaintiff's claims occurred in this district.

10.      Assignment to the Richmond Division of the Eastern District of Virginia is proper

pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part

of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.  **PARTIES**

11.      Plaintiff BRENDA L. HILL MYRICK is the mother of the Decedent, Gregory

Hill, Also Known As Gregory Lee Hill.  Plaintiff is, and was at all relevant times, a resident of

the Commonwealth of Virginia.  On March 10, 2016, Plaintiff duly qualified as Administrator of

the Estate OF GREGORY HILL, ALSO KNOWN AS GREGORY LEE HILL, deceased, in the

Circuit Court of City of Richmond, under the provisions of Virginia Code § 64.2-454.  A copy of

the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A.**  Plaintiff brings

this action in her capacity as Administrator of the ESTATE OF GREGORY HILL, ALSO

KNOWN AS GREGORY LEE HILL, deceased, pursuant to, among other statutes, Virginia

Code § 8.01-50 *et seq.* (wrongful death statute), or, alternatively, pursuant to Virginia Code §

8.01-25 *et seq.* (survival statute).  All relief available under these statutes is sought herein by

Plaintiff.

12.     Defendant NAPHCARE, INC., is an Alabama corporation with operations in Virginia, and in the City of Richmond.  Information obtained from the Virginia State Corporation Commission indicates that its principal office is located in Birmingham, Alabama. At all times relevant hereto, Defendant NaphCare had a contract with Defendant C.T. Woody, Jr., the elected Sheriff of the City of Richmond, Virginia, and/or with the Richmond City Sheriff's Office, and/or with the City of Richmond, Virginia.  By contract, Defendant NaphCare assumed responsibility for the provision of on-site medical services to all inmates/detainees of the Jail, including Mr. Hill, and also for supervising, directing, and controlling health care personnel at the Jail.  Defendant NaphCare was paid in excess of $6.2 million per year to provide healthcare services at the Jail.  Based upon the foregoing, upon information and belief, Defendant NaphCare and its employees/agents (Defendants herein), at all relevant times, provided services to the Jail as an independent contractor.  At all relevant times, Defendant NaphCare and its employees/agents acted under color of state law.  For purposes of Plaintiff's state law claims, Defendant NaphCare is responsible for the actions of all of its employees and/or agents, including, but not limited to, those named as defendants herein, pursuant to *respondeat superior* liability.

13.     Defendant KHAIRUL EMRAN, MD, is a physician licensed in the Commonwealth of Virginia.  At all times relevant hereto, Defendant Emran, MD, was a NaphCare employee and/or agent acting within the scope of his employment and/or agency, and under color of state law.  By serving as "Medical Director," Defendant Emran, MD, assumed responsibility for the provision of on-site medical services to all Jail detainees/inmates, including Mr. Hill, and also for the supervision, direction, and control of health care personnel at the Jail. Additionally, upon information and belief, as medical director of the Jail, Defendant Emran, MD,

was responsible for implementing medical protocols, as well as for the training, duties, and actions of the medical services staff at the Jail.  Defendant Emran, MD, is sued in his individual capacity.

14.     Defendants DONNA PIERCE, RN; ANGELA PATTERSON, RN; AND MARCELLA PASCAL, RN, BSN, were, at all relevant times, Registered Nurses at the Jail. Defendant BEVERLY DANIELS, LPN, was, at all relevant times, a Licensed Practical Nurse at the Jail.  Defendant KELSEY GREEN, at all relevant times, was, upon information and belief, a licensed Medication Aide or Nurse Aide at the Jail, and NAPHCARE JOHN DOE DEFENDANTS 1-5 were, at all relevant times, NaphCare employees and/or agents working at the Jail in January 2016.  At all relevant times, Defendants Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and the NaphCare John Doe Defendants 1-5 were employees and/or agents of NaphCare acting within the scope of their employment and/or agency with Defendant NaphCare, and under color of state law.  Defendants Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and the NaphCare John Doe Defendants 1-5 are sued in their individual capacities.

15.     Defendant C.T. WOODY, JR., as Sheriff of the City of Richmond, is a constitutional officer.  (All references herein to the "Sheriff's Office" are, in fact, to the Sheriff, the elected, constitutional officer.)  Defendant Sheriff Woody operated, directed, and supervised the Jail and his deputies.  At all times while Mr. Hill was detained at the Jail, Sheriff Woody had the duty to maintain the custody and care of Mr. Hill, and otherwise delegated that duty to his deputies, agents, and employees.  Defendant Woody is sued in his individual capacity.   At all relevant times, Defendant Woody was acting under color of state law.  For purposes of Plaintiff's state law claims, Defendant Woody is responsible for the actions of all of his deputies,

employees, and/or agents, including, but not limited to, those named as defendants herein,

pursuant to the doctrine of *respondeat superior* liability.  Further, as discussed more fully below,

the Jail's policies and procedures require the specific advanced approval by Defendant Woody or

his designee prior to placing any Jail resident in an Emergency Restraint Chair.

16.     At all relevant times, Defendants CAPTAIN JOHNSON, DEPUTY McCLOUD,

SGT. O'RARA ALSO KNOWN AS SGT. O'ROARK, LT. FELIX, DEPUTY EVERETT, AND

DEPUTY JOHN DOE DEFENDANTS 1-5 were deputies, agents, and/or employees of

Defendant Sheriff Woody acting within the scope of their employment and/or agency with

Defendant Woody.  At all relevant times, Defendants Johnson, McCloud, O'Rara Also Known

As Sgt. O'Roark, Felix, Everett, and Deputy John Doe Defendants 1-5 were acting under color

of state law.  These Defendant deputies are sued in their individual capacities.

## V.     APPLICABLE STATUTE AND CODE PROVISION

17.     Among other statutory requirements, the Defendants employed at the Jail were

required to comply with Virginia Code § 53.1-126, which states that, with regard to

detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs,

or life threatening conditions."

18.     Further, 6 VAC 15-4-970[2] entitled "Restriction of physical force," provides

"Written policy, procedure, and practice shall restrict the use of physical force to instances of

---

[2]  The Virginia Legislature has directed the Virginia Board of Corrections to establish Minimum
Standards.  Virginia Code § 53.1-68 and § 53.1-5, state, respectively, that "The Board shall
establish minimum standards for the construction, equipment, administration and operation of
local correctional facilities. . . ." and that the State Board of Corrections has the power "to make,
adopt and promulgate such rules and regulations as may be necessary to carry out the provisions
of this title and other laws of the Commonwealth pertaining to local, regional and community
correctional facilities."  Pursuant to that direction, the Virginia Board of Corrections has
prescribed "Minimum Standards for Jails and Lockups," which are generally contained at 6 VAC
15-40.

justifiable self-defense, protection of others, protection of property, orderly operation of the

facility and prevention of escapes.  **In no event is physical force justifiable as punishment.**"

(Emphasis added.)

## VI.    FACTS

### A.    Mr. Hill was arrested on January 5, 2016 and transferred the next day to the Jail

19.    On January 5, 2016, Mr. Hill was arrested in Petersburg, Virginia and transferred

to the Riverside Regional Jail.

20.    On January 6, 2016, Mr. Hill was transferred from Riverside Regional Jail to the

Richmond City Justice Center (the "Jail").  He was listed on the Transfer Form as chronically

suffering from hypertension (high blood pressure).  On the Form, his height and weight are listed

as 5' 7" and 234 pounds.  According to the Transfer Form, Mr. Hill's vital signs were blood

pressure 152/103, pulse 84, respiration 18, temperature 98.3 degrees.

21.    On January 6, 2016 beginning at or about 7:12 p.m.,[3] Mr. Hill was seen by

Defendant Donna Pierce, RN, employee of NaphCare.  Among other things, Defendant Pierce,

RN reportedly conducted a "Receiving Screening" and a "Physical Assessment."  At or about

7:34 p.m., Defendant Pierce, RN took note of several medical stats for Mr. Hill.  According to

records, an abnormal blood pressure reading was noted for Mr. Hill.  His blood pressure was

recorded as **178/123** and his mean arterial pressure (MAP) was 141.33.  Mr. Hill's other vital

signs were recorded to include temperature 98.1, pulse 95, respiration 18, and SaO2 98.  A Pain

---

[3] Although the Jail is located in the Eastern Time Zone, the NaphCare records produced to Plaintiff's counsel pre-litigation indicate that the times for events cited therein, or many of them, are reflected according to Central Standard Time.  Plaintiff does not know at this time how such records should properly be read or were intended to be read.  Accordingly, the correct local times associated with events as recorded by NaphCare may actually be one hour later than those shown in NaphCare's records and in this Complaint.

level of "7" was also noted.  Hypertension was again listed as a chronic condition.  Electronic notations in Mr. Hill's medical records by Defendant Pierce, RN indicate that she "Contacted Dr. Emran" in connection with Mr. Hill's "Abnormal Vital" including his blood pressure reading of 178/123.  The record states that Defendant Pierce, RN then "implemented orders.  administered 0.1mg Clonidine, and 600mg motrin."

22.    At or about 7:50 p.m. on January 6, 2016, records show that Defendant Pierce, RN cleared Mr. Hill to be an "inmate worker."

23.    On that same day (January 6, 2016) at or about 8:44 p.m., "Hypertension" was added to Mr. Hill's "Active Problems List" by Defendant Pierce, RN.

24.    According to NaphCare's records, on January 6, 2016, Mr. Hill was started on Amlodipine Besylate Oral 10 MG, a medication used to treat high blood pressure (10 mg by mouth once a day for 30 days).  The prescription, ordered by Defendant Khairul Emran, MD and "placed" by Defendant Pierce, RN was originally scheduled to stop on February 4, 2016 (it was discontinued on January 19, after Mr. Hill's death).  A "BP Check" was also ordered, according to records, to be done on Monday, Wednesday and Friday, during the period from January 6, 2016 through January 19, 2016.

25.    At or about 10:07 p.m. on January 6, 2016, medical records indicate that Mr. Hill was "relocated" from his then "Present Housing Assignment" of "Intake" to a new area of the Jail, "2D."  The listed purpose or reason for the requested move was **"risk of withdrawal."** (Emphasis added.)  A "low bunk" was specified. The "Individual Requesting Move" was identified in the records as Defendant Pierce, RN.  Upon information and belief, "2D" is a medical unit of the Jail where inmates/detainees with medical complications are housed and purportedly afforded monitoring by medical personnel.

**B.      On January 6, 2016, Defendant NaphCare recorded that Mr. Hill "takes about 3 xanax daily"**

26.      Defendant Pierce, RN then recorded the following note at 10:35 p.m. on January 6, 2016, according to records: "resident initially denied risk of ETOH [ethanol] or drug withdrawal, later asked to come back to medical and stated that he takes about 3 xanax daily. Implemented protocol and relocated to 2D.  Also re-took BP 156/109.  resident stated headache was gone."

27.      Per the medical record, certain additional medications were thereafter prescribed by Defendant Emran, MD and "placed" by Defendant Pierce, RN, scheduled to start on January 7, 2016 (12 a.m.) and stop on January 9, 2016 (11:59 p.m.).  Additionally, per NaphCare records, Vital Signs checks and Blood glucose checks, both to occur twice a day from 12 am on January 7, 2016 to 11:59 pm on January 9, 2016, were ordered by Defendant Emran, MD and recorded by Defendant Pierce, RN.  The medications prescribed were as follows:

| Medication | Dosage |
|---|---|
| Acetominophen Oral 325 MG | Take 650 mg by mouth three times a day for 3 day(s).  Dispense 18 tablet. 0 Refill(s) PRN Muscle pain |
| Promethazine HCl Oral 25 MG | Take 25 mg by mouth three times a day for 3 day(s).  Dispense 9 tablet. 0 Refill(s)  PRN Nausea |
| Loperamide HCl Oral 2 MG | Take 2 mg by mouth three times a day for 3 day(s). Dispense 9 capsule. 0 Refill(s)  PRN Diarrhea |
| Dicyclomine HCl Oral 20 MG | Take 20 mg by mouth three times a day for 3 day(s).  Dispense 9 tablet. 0 Refill(s)  PRN cramps |

**C.      Defendant NaphCare incorrectly noted Mr. Hill to be at risk of *opiate* withdrawal when he was at risk for *benzodiazepine* withdrawal**

28.      In her 12:03 a.m. note on January 7, 2016, Defendant Pierce, RN wrote that Mr. Hill "states he may be at risk for *opiate* withdrawal, takes 3-4 xanax daily." (emphasis added).

***However, significantly, the drug that Mr. Hill identified, Xanax, is <u>not </u>an opiate drug; it is in***

*a wholly different class of drugs called benzodiazepines.  Just as opiates and benzodiazepines are different types of substances with different effects on the body, <u>the withdrawal process and protocol for treating withdrawal from benzodiazepines like Xanax are materially different than that for opiates.</u>*  Withdrawal from opiate drugs such as heroin does not normally cause a serious risk of death.  However, because Xanax, like alcohol, is a central nervous system depressant, just as a person dependent on alcohol who abruptly stops drinking can be at significant medical risk, to include death, if a person taking Xanax stops abruptly, serious symptoms to include tremors, rapid heart rate, irritability, increased tension and anxiety, panic attacks, sweating, confusion and cognitive difficulty, hallucinations, seizures, and psychosis can occur.  If such a person withdrawing from Xanax is not properly monitored and treated by competent health care providers, he can be at serious risk for death.  While medications such as those listed above might be prescribed in an opiate withdrawal situation to manage possible withdrawal-related symptoms (such as those listed in the orders themselves, e.g. "muscle pain" and "nausea"), failing to treat *the actual withdrawal itself* or otherwise monitor it properly would *not* be sufficient for treating benzodiazepine withdrawal because the actual withdrawal process itself can be deadly.  Defendants NaphCare and Emran, MD did not prescribe a protocol for Mr. Hill that would allow him to slowly taper off of Xanax, or, in the alternative, specifically closely monitor his withdrawal process for related serious complications including serious risk of death. Instead, Defendant Pierce, RN wrongly assessed Mr. Hill and wrongly recommended an opiate withdrawal protocol, and Defendant Emran, MD failed to properly review the chart and failed to properly diagnose and order treatment.

    **D.**    **NaphCare's employee Defendant Dr. Emran disregarded Mr. Hill's records and prescribed the wrong medication to Mr. Hill**

29.     As stated above, Defendant Emran, MD disregarded Mr. Hill's chart, failed to properly diagnose Mr. Hill, and wrongfully prescribed treatment for Mr. Hill.  *Continuing through until his death*, *Mr. Hill would consistently be treated by NaphCare providers for the wrong condition*, as additional providers failed to detect the error. The facts indicate that Defendant NaphCare failed to have systems in place to provide that, in situations involving patient drug withdrawal, the correct protocol would be selected and followed for the applicable type of substance that the patient was withdrawing from.  The facts indicate that Defendant NaphCare otherwise did not have systems in place to effectively and properly audit the withdraw protocols implemented by its employees.  Additionally, when NaphCare providers continuously gave Mr. Hill treatment according to the incorrect protocol for his condition, records show that they did not carry out the protocol as ordered, and that they did not respond appropriately to important changes in condition.

### E.     Defendant Pierce, RN continued to incorrectly note the nature of Mr. Hill's withdrawal risk

30.     On January 7, 2016 at 12:03 a.m., after writing erroneously in her "Subjective" section that Mr. Hill "states he may be at risk for *opiate* withdrawal, takes 3-4 xanax daily." (emphasis added) and performing an assessment of Mr. Hill, Defendant Pierce, RN again noted in Mr. Hill's records that he was at risk for opiate withdrawal, not benzodiazepine withdrawal. After noting Mr. Hill's vital signs, including blood pressure 178/123, temperature 98.1, pulse 95, respiration 18 and SaO2: 98 (values identical to the ones previously recorded), Defendant Pierce, RN wrote under "Assessment," "At risk for *opiate* withdrawal." (Emphasis added).  In addition to again misidentifying Mr. Hill's presentation, her note continues to describe a protocol appropriate for *opiate* withdrawal, *not benzodiazepine withdrawal.*  For "Plan," Defendant Pierce, RN wrote, "Vitals q8h [every 8 hours], Blood glucose checks twice a day; Aggressive

14

hydration; Limit activity to bedrest as much as possible; Bottom bunk; reassure patient; Patient educated and verbalizes understanding of self-care, symptoms to report, and when to return for follow-up; Will reassess and contact Advanced Clinical Provider if nausea, vomiting, diarrhea, or muscle cramps persistent or uncontrolled; Verbal order for PRN [as needed] medications given by Dr. Emran." The instructions indicate that Defendant Pierce, RN gave Mr. Hill erroneous information about reporting symptoms, following up, and performing self-care, as she instructed him in accordance with *the wrong condition*. At 12:04 a.m., a Progress Note by Defendant Pierce, RN mentions the same "abnormal vital" – blood pressure of 178/123- and "follow-up BP" of 156/109- as recorded in several prior notes.

### F.      Defendant NaphCare and its employees botched Mr. Hill's care

31.     In addition to the grave error of incorrectly diagnosing Mr. Hill's detox condition and implementing the wrong detox protocol for him, records indicate that on January 7, 2016, Defendant NaphCare and its defendant employees: 1. Did not take either of two ordered glucose readings; 2. At most, took only one of the two sets of ordered daily vital signs;[4] 3. Did not assess or treat Mr. Hill for withdrawal after 3:27 a.m.; 4. Did not specify what treatment was given to Mr. Hill at 3:27 a.m., including whether any medication was administered; 5. Did not record efforts at "aggressive hydration" or Mr. Hill's tolerance thereof; and 6. Did not administer to Mr. Hill his ordered Amlodipine (blood pressure medication for the high blood pressure condition that he actually had) or did not record having done so.

### G.      On January 8, 2016 Defendant Patterson, RN failed to communicate to a doctor Mr. Hill's new symptoms

---

[4] The one set of vital signs noted on January 7, 2016 at 12:03 a.m., and the follow up blood pressure at 12:04 a.m., may have been repeated from the day before, as they are identical to the values recorded on the evening of January 6.

32.     On January 8, 2016 at 10:59 p.m., a notation in Mr. Hill's records indicates that NaphCare personnel were presented with a significant change in condition by Mr. Hill. Defendant Angela Patterson, RN recorded Mr. Hill's complaint that "I got nausea pain and dizzy." Mr. Hill's vital signs were recorded as blood pressure 152/102, temperature 97.4, pulse 78, respiration 18, pain "2." Defendant Patterson, RN wrote, "resident a/o x 3, skin w/d no resp distress noted, gait steady, resident c/o 'dizzy and nausea.' denied any vomiting or diarrhea." Under "Assessment," Defendant Patterson recorded, "alteration in comfort." For "Plan," she noted "to cont. to monitor and recheck blood pressure and medicate pm." She also noted that Mr. Hill was educated concerning "medication and detox protocol." Defendant Patterson, RN also failed to properly review the chart and detect that Mr. Hill was being treated for a condition that he did not have (and that his benzodiazepine withdrawal was not being properly treated), and she presumably "educated" him according to the wrong protocol. There is also no indication in the record that Defendant Patterson, RN communicated to a doctor Mr. Hill's new symptoms and change in condition.

**H.     After continuous misdiagnosis, incomplete treatment, and worsening medical symptoms, NaphCare providers approved Hill to be placed in General Population**

33.     On January 9, 2016 at 5:07 a.m., Defendant Patterson, RN made a late entry for the day before, noting, "resident had elevated b/p 1-8-16 2045 during detox assessment rechecked was 126/64." It is unclear what time the "rechecked" blood pressure of 126/64 was obtained. Additionally, the actual reading of the "elevated b/p" from 2045 (8:45 p.m.) does not appear to have been recorded, nor whether any treatment was administered in response. Alternatively, it could be that the "elevated b/p" reading purportedly obtained at 8:45 p.m. on January 8 is the "152/102" value that Defendant Patterson, RN recorded over two hours later at

10:59 p.m. when she also documented Mr. Hill's complaints concerning his change in condition; if so, still, no treatment in response was recorded. If the 8:45 p.m. elevated rate was separate from the 10:59 p.m. recorded rate of 152/102 and the recheck occurred prior to 10:59 p.m., it would not appear that the 10:59 p.m. elevated rate was rechecked or reconciled.

34.     For January 8, 2016, NaphCare records therefore show: 1. NaphCare continued to assess Mr. Hill for the wrong withdrawal process; 2. there is no indication that withdrawal medication (although ordered in connection with the wrong protocol and condition) was administered;  3. there is no indication that Amlodipine was administered – medication for a condition Mr. Hill *did have*, high blood pressure;  4. only one set of vital signs was taken (vs. the order to take them twice a day);  5. no blood sugar readings were taken (vs. the order to take them twice a day); 6. there are no recorded efforts at "aggressive hydration" or Mr. Hill's tolerance thereof;  7. there is no monitoring for detox noted for at least twelve hours (between 8:27 a.m. and 8:45 p.m., when, according to Defendant Patterson, RN's late entry, an elevated blood pressure was noted during detox assessment); 8. improper record keeping for a patient on detox status occurred (recording entries late, not recording the actual reading of an elevated blood pressure, nor whether treatment was administered, nor time when blood pressure was rechecked); 9. Mr. Hill's elevated blood pressure at 10:59 p.m. may not have been re-checked or reconciled, and, in any event, his blood pressure appeared to be reaching high peaks and not stabilizing; 10. no reporting was made to a physician of Mr. Hill's change in condition ("nausea pain and dizzy"); and 11. there was no reconciliation/stabilization of Mr. Hill's change in condition.

35.     Despite the change in condition noted the night before and his recurring high blood pressure that, like his withdrawal, was not being treated effectively on the medical unit, on

January 9, 2016 at 6:57 a.m., an entry by Defendant Marcella Pascal, RN, BSN informed that Mr. Hill should be moved from his then present assignment location (2D-12-A) to General Population.  Defendant Pascal, RN, BSN wrote, "Pt. can be moved to general population; no special needs." There is no indication that a physician was consulted concerning the planned move of Mr. Hill, or that Mr. Hill was examined immediately prior to the move.  NaphCare employees therefore decided to move Mr. Hill away from 2D and into General Population when his change in condition from the night before had not been reported to a physician or stabilized, he had not been recently assessed, he was not consistently receiving his medication for high blood pressure, and he was only approximately 57 hours into a detox program that they erroneously implemented for the *wrong condition* (and, per records, were not consistently performing anyway).  NaphCare providers also apparently moved Mr. Hill without performing a review of his chart, because, again, *no one noticed* that NaphCare had wrongfully diagnosed and treated him.

36.     Despite his worsening condition, NaphCare providers continued to incorrectly treat Mr. Hill and fail to carry out the assigned protocol.  According to the "Most Current Medications and Treatments Administered" section of one "Release Summary" later created by NaphCare for Mr. Hill, at 7:26 a.m. on January 9, 2016, Mr. Hill was administered his Amlodipine for high blood pressure, and at 11:41 a.m., he was administered Acetominiphen, Promethazne, Loperamide, and Dicyclomine, his withdrawal medications prescribed in accordance with the wrong drug protocol.  The same document indicates that at 3:55 p.m., a blood glucose check was "refused."  However, among the NaphCare documents produced to Plaintiff's counsel pre-litigation, there are no contemporaneous, underlying records of these purported medication administrations/ blood glucose check having occurred; they are simply

18

listed in one "Release Summary" report dated after the purported events.[5]  Additionally, there is

no note explaining the circumstances of the purported "refusal," nor any attempt to recheck the

blood sugar thereafter, nor any reporting of the purported "refusal" to a physician.

37.     On January 10, 2016, **the day after Mr. Hill's death**, Defendant Marcella Pascal,

RN, BSN made a "late entry for 1/9/15 [sic] 218 pm."  The entry, which, as noted, reflects events

that purportedly happened before the purported refusal of a blood glucose check at 3:55 p.m.,

reads: "Pt. seen in medical to have blood pressure checked.  Pt. alert and oriented x4, able to

voice needs.  Denied any chest pain, dizziness, SOB, or headache.  VS 144/98, 97.3-74-18-100%

RA."

38.     For January 9, 2016, NaphCare records show: 1. Mr. Hill was moved to general

population shortly after experiencing a change in condition that was not properly treated or

resolved prior to the move, and when the records kept do not evidence effective stabilization of

his high blood pressure; 2. Mr. Hill was moved without a complete review of his chart and

---

[5] Curiously, there are actually two "Release Summary" reports in the records, which contain
different information.  The first "Release Summary" states that it was created by Defendant
Angela Patterson, RN on January 9, 2016 at 6:11 p.m. Central Standard Time.  As noted above,
Plaintiff does not know why the records are in Central Standard Time or if they reflect accurate
times.  This time, 6:11 p.m., however, indicates that Defendant Patterson, RN, while in a Jail in
Virginia, which, as noted above, uses Eastern Standard Time, either converted the local time of
7:11 p.m. Eastern to Central Standard Time before recording it, the NaphCare records program
otherwise automatically converted the time, or this record conflicts with other records.  A local
time of 6:11 p.m. contradicts other records that indicate that EMS was not even called until later
(approximately 6:55 p.m.) and so Mr. Hill was not "released" from NaphCare/Jail care at 6:11
p.m. local time on January 9, 2016. Although purportedly "created by" Defendant Patterson, RN,
this Release Summary is signed not by Patterson, but by a "Jessica Harbinger, Legal Secretary."
The second "Release Summary" in the record, which, unlike the first Summary, leaves blank
sections for "Active Medications" and "Most Current Medications and Treatments
Administered," and adds "Inmate Death" to the "Active Problem List" (the "Date Identified" for
the "Inmate Death" is January 11, 2016, two days after Mr. Hill's actual death), states that it was
created on January 26, 2016, several weeks after Mr. Hill's death.  It is also signed by a "Jessica
Harbinger, Legal Secretary."  The record may indicate that Defendant NaphCare reviewed this
matter in January 2016 after Mr. Hill's death in connection with potential perceived legal
liability.

without anyone realizing that he had been treated erroneously for opiate withdrawal/ needed different withdrawal treatment; 3. Mr. Hill was moved without a pre-move examination; 4. Mr. Hill was moved without consult with a doctor (and without doctor evaluation of the progress of the detox program that- although erroneous- he had been ordered to be on by a doctor); 5. Mr. Hill was moved after only about 57 hours on detox treatment, when he was still supposedly being treated, albeit in connection with the wrong drug protocol;  6. Nothing was recorded before Mr. Hill's move as to criteria for moving a detox patient/ how Mr. Hill purportedly met the criteria; 7. No glucose reading was taken; 8. No report was made to a physician when a glucose reading was purportedly refused; 9. Glucose reading was never re-attempted after it was purportedly refused (vs. order to take it twice a day); 10. Assuming the vital signs recorded after Mr. Hill's death did occur at the time and date cited, vitals were only taken once (vs. order to take them twice a day); 11.  If records are correct, NaphCare providers would have seen Mr. Hill at approximately 4 p.m. on January 9 (when his glucose check was purportedly "refused"), which is close to the time when EMS records (5:54 p.m.) indicate that EMS were told by Jail staff that Hill "began experiencing 'erratic and abnormal behavior'" and "tried to escape the cell block," and they would have had yet another opportunity to correct their diagnosis and treatment errors, but they did not.

**I.      On the afternoon of January 9, 2016, Mr. Hill began to display signs of distress**

39.     Thereafter, according to records from EMS, VCU Medical Center and the Office of the Chief Medical Examiner[6], Mr. Hill experienced another change in condition and started

---

[6] Defendant Sheriff Woody declined to provide to Plaintiff's counsel pre-litigation any records in the Jail's possession other than Mr. Hill's medical records and certain contract and policy documents, despite having the discretion to do so if he so chose.  Counsel responding to a records request on Defendant Sheriff Woody's behalf noted that Defendant Woody was

displaying signs of distress. Upon information and belief, because he had not been treated for benzodiazepine withdrawal, Mr. Hill began to experience complications associated with such withdrawal, to include some or all of the following: tremors, rapid heart rate, irritability, increased tension and anxiety, panic attack, sweating, confusion and cognitive difficulty, hallucinations, and psychosis (an abnormal condition of the mind described as involving a "loss of contact with reality"). Mr. Hill reportedly told deputies that someone was after him or trying to kill him. Many of Mr. Hill's statements did not make any sense. Indeed, the Medical Examiner, who was provided with limited Jail records in connection with her autopsy, described that Mr. Hill "became delusional and agitated." Despite his presenting with the foregoing symptoms – clearly indicating that Mr. Hill's behavior was not provoked by belligerence, but, rather, by a medical crisis – deputies failed to contact the medical department immediately. When deputies finally determined to take Mr. Hill to the medical department, deputies characterized Mr. Hill as resisting, and they physically restrained him and sprayed him with pepper spray. The Medical Examiner's report states that "Jail reports did relay that oleoresin capsicum ("Pepper Spray") was used in the process of trying to subdue Mr. Hill's agitation. …"

**J.** **After physically restraining Mr. Hill, Defendant deputies contacted NaphCare personnel, who recommended immediate transfer to a hospital**

---

withholding other records under Virginia Code §§ 2.2-3706(A)(2)(d) and 2.2-3706(A)(2)(i); although documents under these Sections are not subject to mandatory disclosure, they may be produced *at the custodian's discretion*, as long as not otherwise prohibited by law. As a result, and because the Jail is a closed institution, Plaintiff did not have access to many documents often produced pre-litigation in cases involving jails, such as staffing schedules, incident reports, investigative reports, statements, officer logs, and internal memos. Plaintiff therefore has prepared this Complaint on the basis of reports and information from sources including NaphCare medical records, EMS, VCU Medical Center, and the Office of the Chief Medical Examiner. Discovery in this matter should reveal significantly additional information concerning actions of Jail deputies.

40.     After Defendant deputies physically restrained and pepper sprayed Mr. Hill, they eventually escorted him to Medical.  The NaphCare providers determined that, based on his condition, Mr. Hill needed to be sent to the hospital.   NaphCare providers contacted the doctor on call (upon information and belief, Defendant Emran, MD), who ordered the providers to send Mr. Hill to VCU Medical Center.  (None of the foregoing is contained in any NaphCare medical record – NaphCare failed to document the encounter in the records that were provided to Plaintiff.)  During the course of events, the Sheriff's Office Defendants were reportedly warned by NaphCare providers that, "if you do not send him out of here [to the hospital], he is going to die," or words to that effect.

41.     However, against the orders of NaphCare providers, Mr. Hill was not taken directly to the hospital.  Instead, Mr. Hill was transported out of the medical department to pod 1D of the Jail.  Deputies then placed Mr. Hill, an inmate who they reportedly had been warned needed immediate emergency medical care, into a restraint chair.  Upon information and belief, Mr. Hill was strapped tightly into the Emergency Restraint Chair.

42.     Further, according to observations of the Medical Examiner and related conversations, immediately prior to being strapped into the "**Emergency** Restraint Chair" (emphasis added), and after NaphCare providers had recommended direct transportation to VCU Medical Center, Mr. Hill appeared to be behaving appropriately.  According to Assistant Chief Medical Examiner Lauren Huddle, MD, who viewed limited Jail video footage and reports, Mr. Hill can be seen in video walking, escorted by deputies, to a 1st floor room prior to being placed in the restraint chair.  (He had been housed on the 6th floor.)  According to Dr. Huddle, in the video, Mr. Hill appeared to be sweating heavily and to be disheveled.  Mr. Hill was escorted from the 6th floor of the Jail to a 1st floor room, and, then, was apparently strapped into the

Emergency Restraint Chair.  Any previous alleged behavior was absent when Mr. Hill was walking to the 1st floor room; indeed, what Mr. Hill's presentation – a man sweating heavily and in a disheveled state – evinced was a person in need of medical attention, not undue punishment.

43.     Jail procedures make clear that Emergency Restraint Chairs are to be used "only in extreme instances and only when other types of restraints have proven ineffective."  Because of the known serious risks associated with the use of restraint chairs, the Jail's policies and procedures require advanced approval by Defendant Woody or his designee prior to placing any resident in an Emergency Restraint Chair.  The procedures also state that Emergency Restraint Chairs are intended to help control "combative, self-destructive or potentially violent residents." The facts set forth above make clear that there was **no proper basis for the Sheriff's Office Defendants to strap Mr. Hill into an Emergency Restraint Chair.**  At the time when he was strapped into an Emergency Restraint Chair, Mr. Hill was not disruptive.  Indeed, both NaphCare provider recommendations and Mr. Hill's own behavior indicated that he was in *medical* distress and in need of emergency medical intervention, not the further stress and constraint of an Emergency Restraint Chair.

**K.     After leaving the Medical Department with Mr. Hill and unduly putting him in a restraint chair, the Sheriff's Office Defendants failed to properly inform medical personnel of Mr. Hill's condition until he was nearly unresponsive**

44.     At 1840 (6:40 p.m.) on January 9, 2016, NaphCare records indicate that after restraining Mr. Hill in the restraint chair, the deputies again contacted NaphCare providers. Reportedly perplexed and frustrated by the deputies' actions in using the restraint chair, the NaphCare providers left the pod to call a NaphCare supervisor – the Director of Nursing and/or the Health Services Administrator.  Before they could do so, however – indeed, upon

information and belief, before they could even reach the elevator – the NaphCare providers were called back to the pod because Mr. Hill had become unresponsive in the restraint chair.

45.    According to NaphCare's "Medical Emergency Code Report" form, "deputy staff called medical deputy asking if pt. can be assessed by medical staff.  Per deputy staff pt. was combative."  Under "Chief Complaint," the report states, "check restraints," and under "Onset," it reads "sudden." The "Position of Patient **Upon Arrival**" was described as "sitting in restraint chair."  (Emphasis added.)  The "Witnesses" listed on the form, who are also referenced as the "Officers Involved," include the following: "Captain Johnson, McCloud, Sgt. O'rara [Also Known As Sgt. O'Roark], Lt. Felix, Deputy Everett."  Upon information and belief, these Jail deputy Defendants (along with Defendant Woody) participated in and/or authorized the restraining in the restraint chair and pepper spraying of Mr. Hill, and/or who otherwise failed to provide Mr. Hill access to urgently needed medical care on January 9, 2016.  "Deputy John Doe Defendants 1-5" refers to any other deputies besides the deputy named Defendants who participated in the pepper spraying and/or the strapping into the restraint chair of Mr. Hill, a pre-trial detainee, and/or who otherwise failed to provide Mr. Hill access to urgently needed medical care on January 9, 2016, as discussed and charged throughout this Complaint.  The "Health Care Staff Involved" are listed on the NaphCare "Medical Emergency Code Report" as "Pascal, RN BSN" and "Daniels, LPN"; additionally, under "Signature/Credentials of Staff Involved" at the end of the report, the signature of "Kelsey Green" and another illegible signature are present in addition to Defendant Daniels, LPN's signature, while Defendant Pascal RN, BSN signed next to "Signature / credentials of Person Completing Report."  "NaphCare John Doe Defendants 1-5" refers to all other NaphCare employees/agents besides the named Defendants Emran, Pierce, Patterson, Pascal, Daniels and Green who wrongfully diagnosed and/or treated Mr. Hill in

January 2016, and/or who wrongfully failed to provide him with proper medical care or access to proper medical care in January 2016, including urgently needed medical care on January 9, 2016, as discussed and charged throughout this Complaint.

46.     The "Medical Emergency Code Report" further contains the following timeline of events:

1840    Deputy staff called medical deputy asking if pt. can be assessed by staff.

1843    Medical staff arrived to [pod] 1D to assess pt.  Deputy staff were securing pt. in restraint chair.

1848    Pt. unresponsive to name [and] sternal rub.  No palpable pulse, pupils were fixed and respirations ceased.  [No] signs of life.

1850    CPR initiated while pt. was in restraint chair.  Restraints released by deputy staff [and] pt. was lowered to the ground where CPR continued.

1855    911 called and AED placed on pt.  [No] shock advised.  CPR continued.

1905    EMS arrived.  CPR continued by medical staff until relieved by EMS @ 1907.

1938    EMS departed.

47.     The "Medical Emergency Code Report" also states: "[No] apparent injuries noted."[7]  It documents Mr. Hill's medical history of "HTN" (hypertension), but has no mention of his Benzodiazepine withdrawal risk.  Mr. Hill would be declared dead at 7:50 p.m., just 12 minutes after NaphCare's last recorded timeline entry.

48.     As reflected in their timeline, the Defendant NaphCare providers documented shortly after their arrival that Mr. Hill was unresponsive and had no respirations, no pulse, and

---

[7] As noted herein below, the Medical Examiner on autopsy described "evidence of non-lethal superficial blunt force trauma," including "an abrasion and surrounding contusion on the left wrist, and a contusion of the right side of the neck with underlying superficial soft tissue hemorrhage and subgaleal hemorrhage of the scalp with no underlying skull fractures."  The medical examiner also noted a "rib fracture," but noted it "may be associated with cardiopulmonary resuscitation."

fixed pupils.  Defendant NaphCare providers did not record having witnessed any medical event that led to such a condition.  The "Medical Emergency Code Report" further indicates that CPR was not started until 1850, and the medical emergency code, or "M10-18," was not called until 1900, both *after* the arrival of NaphCare medical providers "@ 1843."

49.    Further, remarkably, even when encountering Mr. Hill in an unresponsive, emergency state with no pulse, Defendant NaphCare providers *still did not recognize their error in treating him for opiate withdrawal instead of benzodiazepine withdrawal, and their records do not indicate that they <u>ever</u> recognized this error.*

**L.    EMS personnel arriving on the scene recorded that Mr. Hill was not breathing spontaneously and had no pulse**

50.    EMS recorded that upon their arrival at Mr. Hill at or about 7:02 p.m. (NaphCare records state EMS arrival at 7:05 p.m.), Mr. Hill was not breathing spontaneously and had no pulse.  According to EMS, Mr. Hill had blood in his nostrils and his eyes were bloodshot.   The EMS report indicates that Jail deputies and NaphCare providers gave incomplete records of the incident.  The EMS providers describe that they were informed by Jail staff that Mr. Hill "began experiencing 'erratic and abnormal behavior' around 1754 and tried to escape the cell block." The EMS report reflects that EMS were told that Mr. Hill was placed "in a chair and [when] [jail staff] went to take his handcuffs off he slumped forward."  The EMS report, among other things, does not describe how the Sheriff's Office Defendants ignored a recommendation to send Mr. Hill directly to the hospital before the restraint chair use, even when NaphCare providers reportedly told them Mr. Hill would die if not sent to the hospital, and does not reference deputies having used pepper spray on Mr. Hill.

51.    EMS also recorded in its records of the incident, "The 911 process was activated *right away* and their medical staff began CPR at 1900." (emphasis added).  The incoming call to

911 dispatch was shown on EMS records to have occurred at 1858 (6:58 p.m.); NaphCare records place the 911 call at 6:55 p.m., which is *five minutes after* NaphCare records say that CPR was initiated at 6:50 p.m.

52.     The EMS records do confirm that NaphCare medical personnel were aware of the potential for Mr. Hill to suffer withdrawal from Xanax.  Indeed, the EMS records state that "…[Mr. Hill] told medical staff when he arrived he was detoxing from Xanax abuse." EMS was further informed "pt. also has HTN [hypertension, or high blood pressure], for which he takes Amlodipine."  Again, however, even as Mr. Hill was unresponsive and being emergently treated by EMS, *no NaphCare providers recognized that they had been erroneously treating Mr. Hill for opiate withdrawal.*

53.     After undertaking certain resuscitation efforts, EMS contacted "MCV for cease resuscitation as pt remains in asystole."[8]  Then, per EMS records, "pt [had] [a] brief episode of PEA/ idioventricular rhythm."[9]  EMS notified the hospital of the change, and, presumably as a result of the change, transported Mr. Hill to VCU Medical Center (MCV Hospital).

**M.     Mr. Hill "presented" at VCU Medical Center "in cardiac arrest"**

54.     VCU Medical Center records indicate that Mr. Hill arrived in their Emergency Department at 7:43 p.m. on January 9, 2016.  Hospital providers noted that Mr. Hill "presents in cardiac arrest."  Despite continued resuscitation efforts by Emergency Department providers, including CPR and epinephrine administration, Mr. Hill did not regain a pulse.  Resuscitation efforts were ordered ceased and Mr. Hill was declared deceased at 1950 (7:50 p.m.) on January 9, 2016 by Emergency Department Attending Physician Joseph Romano, MD.

---

[8] Refers to a condition wherein the patient is in "flatline," with no cardiac electrical activity.
[9] Refers to when a patient has electrical activity on the EKG, but no mechanical heart contractions to pump blood (no pulse).

**N.      Jail Staff reported Mr. Hill's cause of death to media as "Cardiac Arrest" with no mention of use of restraints or pepper spray despite the Chief Medical Examiner stating cause of death as "unknown"**

55.      As previously noted, an autopsy of Mr. Hill's body was performed by the Office of the Chief Medical Examiner ("OCME"), Richmond, Virginia division.  The OCME pathologist Dr. Huddle noted Mr. Hill's reported "delusional and agitated," "diaphoretic and disheveled" state, and reports of his being put in a restraint chair and subjected to pepper spray at the Jail.  Dr. Huddle's report also mentions Mr. Hill's reported medical history of hypertension and Alprazolam abuse (Xanax is a brand name for Alprazolam).  Dr. Huddle stated that the "autopsy revealed evidence of morbid obesity and severe coronary artery disease."  She also documented "evidence of non-lethal superficial blunt force trauma," including "an abrasion and surrounding contusion on the left wrist, and a contusion of the right side of the neck with underlying superficial soft tissue hemorrhage and subgaleal hemorrhage of the scalp with no underlying skull fractures."  Dr. Huddle found a "rib fracture," but noted it "may be associated with cardiopulmonary resuscitation."  Dr. Huddle did not note in her report the NaphCare Defendants' wrongful treatment of Mr. Hill for opiate withdrawal; however, the **Jail/NaphCare declined to provide any medical records concerning Mr. Hill to the medical examiner.** Indeed, Dr. Huddle wrote in her report that "**limited** reports and video surveillance footage were provided by the jail **despite multiple requests from the local police department**." (emphasis added).  Dr. Huddle determined that she could not identify a cause of death with the information available, and she marked the official "Cause of Death" as "Undetermined."  She wrote, "due to the findings of significant natural disease, the possibility of withdrawal seizures in a setting of reported alprazolam abuse, use of restraint and **the limited information provided by the jail facility**, the cause and manner of death cannot be determined."  (Emphasis added.)

56.     Despite the OCME's finding in its report dated *May 28, 2016* that Mr. Hill's cause of death was "Undetermined," and despite the Medical Examiner's reference to little information being released by the Jail in response to numerous police requests and to blunt force trauma, Jail officials reportedly told news outlets *as early as January 10, 2016* that Mr. Hill had "suffered what medical staff believe to be a heart attack in his housing unit," and that "there is no suspicion of foul play."  News stories publishing these Jail remarks did not include any information concerning Mr. Hill's having been placed in a restraint chair and pepper sprayed by Jail officials, nor the Sheriff's Office Defendants' having ignored urges by NaphCare providers to send Mr. Hill to a hospital, nor any allusion to the wrongful diagnosing and treatment of Defendant NaphCare and its Defendant employees.

**O.     Defendants Owed Various Duties to Mr. Hill**

57.     At all times while Mr. Hill was detained at the Jail, until he was emergently transported out of the Jail and to VCU Medical Center by EMS, Mr. Hill was in the custody and under the care of Defendant Sheriff Woody, and Defendant Sheriff Woody's employees/agents, including, but not limited to, Defendants Captain Johnson, Deputy McCloud, Sgt. O'Rara Also Known As Sgt. O'Roark, Lt. Felix, and Deputy Everett, and the Deputy John Doe Defendants 1-5, and Defendant NaphCare and its employees, including, but not limited to, Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Kelsey Green; and NaphCare John Doe Defendants 1-5.

58.     The Defendants owed duties to Mr. Hill.  Among these duties, Defendants, and each of them, had statutory and common law duties of care to Mr. Hill, including affirmative duties to provide adequate and safe, secure, and humane conditions of detention, including adequate medical care or access to adequate medical care.

59.     At all relevant times herein, Defendants, and each of them, had duties to Mr. Hill, a pretrial detainee, pursuant to the Fourteenth Amendment of the U.S. Constitution.

60.     Pursuant to state statute, Defendant Sheriff Woody was responsible for the day-to-day operations at the Jail, and had the duty of care and custody for Mr. Hill while he was detained at the Jail.  Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 et seq. and 15.2-1609.

61.     Defendant Woody, by and through his agents and employees, including, but not limited to, Defendants Captain Johnson, Deputy McCloud, Sgt. O'Rara Also Known As Sgt. O'Roark, Lt. Felix, and Deputy Everett, and the Deputy John Doe Defendants 1-5, and Defendant NaphCare and its employees, including, but not limited to, Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and NaphCare John Doe Defendants 1-5, had specific statutory duties to provide, or provide access to, medical treatment to Mr. Hill under Va. Code § 53.1-126.  Under that statute, the foregoing Defendants had a specific responsibility to inmates/detainees, in that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions."  *Id.*

62.     Moreover, Virginia legislative authority also enabled various regulations, including, but not limited to, those requiring that 24-hour emergency medical care be made available to inmates and detainees.  Va. Code §§ 53.1-68, 53.1-95.2; 6 VAC 15-40-360.

63.     In connection with Plaintiff's state law claims, Defendants Woody and NaphCare, and each of them, are accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of *all* of their employees and agents, including, but not limited to, the named Defendants, the Deputy John Doe Defendants 1-5, and NaphCare John Doe Defendants 1-5 taken within the scope of their employment/agency.

64.     The NaphCare Defendants owed duties to Mr. Hill to treat him in accordance with recognized and acceptable standards of medical and nursing care and treatment.

65.     All Defendants owed duties to Mr. Hill to exercise reasonable care in providing medical, nursing care, and/or professional, and/or correctional services, to Mr. Hill during the time period of his incarceration at the Jail.

66.     Defendants NaphCare and its employees, Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and NaphCare John Doe Defendants 1-5 had duties to render that degree of knowledge, skill, diligence and care to Mr. Hill that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

67.     As to Defendant NaphCare's related *respondeat superior* liability, it is asserted, <u>in the alternative</u>, that, in the context of the facts of this case, NaphCare and its employees, including, but not limited to, named Defendants and the NaphCare John Doe Defendants 1-5, were not health care providers under Virginia Code § 8.01-581.15, and the provisions of Virginia Code § 8.01-581.15 do not apply to their conduct.

68.     All of the duties of all of the Defendants, and each of them, as described herein, were shared by the Defendants, individually and collectively.

**P.      Defendants breached duties owed to Mr. Hill; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew**

69.     Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Mr. Hill, and were negligent, grossly negligent, willfully and wantonly negligent, and deliberately

indifferent to Mr. Hill's care and needs, and/or committed intentional acts of harm in their care and treatment of him.

70.     In disregard of Mr. Hill's statements that he was using Xanax (therefore at risk of benzodiazepine withdrawal), Mr. Hill's numerous medical complaints and requests for treatment, and his declining medical presentation including new, unresolved symptoms, and the duties and responsibilities of the Defendants; and in bold defiance of Mr. Hill's constitutionally protected rights; Mr. Hill was regularly denied access to adequate medical care.

71.     Because of, among other things as described herein, Mr. Hill's clear and obvious signs of medical distress during the evening of January 9 (including, but not limited to, as described herein, agitation accompanied by delusions and nonsensical statements and heavy sweating and disheveled appearance), as well as direct warnings from healthcare professionals that Mr. Hill needed emergent care **("if you do not send him out of here [to the hospital], he is going to die")** (Emphasis added.), Defendant Sheriff Woody, and Defendant Sheriff Woody's employees/agents, including Defendants Captain Johnson, Deputy McCloud, Sgt. O'Rara Also Known As Sgt. O'Roark, Lt. Felix, Deputy Everett, and the Deputy John Doe Defendants 1-5 ("Sheriff's Office Defendants"), were aware of Mr. Hill's serious condition, and the worsening nature of his condition.  However, these Sheriff's Office Defendants were grossly negligent and deliberately indifferent to Mr. Hill's condition.  These Sheriff's Office Defendants failed to contact the medical department immediately, and when they finally determined to take Mr. Hill to the medical department, they first further injured him by physically restraining him and pepper spraying him, only to later simply ignore the Jail's own medical providers' directive that Mr. Hill immediately get urgently needed hospital care.  Despite any previous alleged unusual behavior clearly being absent when they led Mr. Hill from Medical to the 1st floor room and signs of

medical distress continuing to be apparent (heavy sweating, disheveled appearance), these Sheriff's Office Defendants took Mr. Hill away from medical providers and, upon information and belief, tightly strapped Mr. Hill into the restraint chair strictly *for illegal punitive purposes, directly against medical staff orders,* and not out of any concern for his safety, but in deliberate disregard for his safety and welfare.  Rather than responding immediately to Mr. Hill's deteriorating medical condition by calling EMS, the Sheriff's Office Defendants deliberately disregarded Mr. Hill's acute medical needs and deliberately kept him from timely emergency medical treatment, causing his worsening condition and death.

72.     Because of, among other things as described herein, their examinations/ observations of Mr. Hill, including on the day of his death when they believed he needed to go to the hospital given his presentation, and the documentation in Mr. Hill's medical records that clearly showed that Mr. Hill was being treated for the wrong medical condition, was not being treated/monitored for the correct medical condition, was not even receiving the erroneously ordered treatment as ordered, and was being ushered out of the medical department to general population despite new, unresolved significant symptoms, Defendant NaphCare and its employees, Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and NaphCare John Doe Defendants 1-5 (the "NaphCare Defendants") were aware of Mr. Hill's serious condition, and the worsening nature of his condition.

73.     However, the NaphCare Defendants were negligent, grossly negligent, and/or deliberately indifferent to Mr. Hill's medical condition.  The NaphCare Defendants failed to conduct proper examinations, failed to make an accurate diagnosis, failed to form and carry out a proper and effective treatment plan with regard to Mr. Hill, failed to keep proper records, failed to properly review Mr. Hill's medical chart, failed to properly coordinate care, failed to report up

the chain of command properly and effectively, failed to medically stabilize Mr. Hill, and pushed

Mr. Hill out of the medical department and into general population despite unresolved new and

significant symptoms.  Despite Mr. Hill's having informed them of his use of the benzodiazepine

Xanax and such being recorded in their records numerous times, the NaphCare Defendants never

treated Mr. Hill for benzodiazepine withdrawal – they kept treating the wrong condition time

after time. Defendant NaphCare failed to have systems in place to provide that, in situations

involving patient drug withdrawal, the correct protocol would be selected and followed for the

applicable type of substance that the patient was withdrawing from, and otherwise failed to have

systems in place to effectively and properly audit the withdraw protocols implemented by its

employees.  The NaphCare Defendants' multiple failures to provide proper care resulted in Mr.

Hill's presenting with severe, life-threatening symptoms on the evening of January 9, 2016.

Even then, when they opined that Mr. Hill urgently needed to go to the hospital or he would die,

the NaphCare Defendants watched the Sheriff's Office Defendants simply leave the Medical

Department with Mr. Hill, a gravely ill person; they did not call EMS or even follow up to see

what the Sheriff's Office Defendants were doing other than calling EMS, but apparently did

nothing until contacted again by the Sheriff's Office Defendants, at which time or shortly after

which time Mr. Hill was already unresponsive.

74.     All Defendants, including the Sheriff's Office Defendants and the NaphCare

Defendants, failed to respond, or responded with deliberate indifference or abuse, to Mr. Hill's

deteriorating medical situation.

75.     All Defendants breached their express duties as set forth in the statutes, rules,

policies, and procedures applicable to the Defendants.  Among other provisions, Defendants

failed to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to

detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs, or life threatening conditions."

76.     Thus, the Defendants violated: an express directive by the Virginia General Assembly to provide medical treatment for all serious medical needs or life threatening conditions; the U.S. Constitution; as well as their individual expressed duties and responsibilities, in failing to provide Mr. Hill with adequate medical care, and/or access to adequate medical care.

77.     Indeed, the joint and several conduct of each of the Defendants, and/or of their agents and/or employees, alone or in combination, as aforesaid, was so wanton or dispatched with such negligence as to evince a conscious disregard for the rights, health, and well being of Mr. Hill.

78.     Defendants' actions and omissions, in denying obvious and necessary care and attention to Mr. Hill, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence, when combined, had a cumulative effect showing a reckless or total disregard of Mr. Hill.

**Q.     Defendants' wrongful conduct and omissions caused Mr. Hill's worsening condition and death**

79.     As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, deliberately indifferent, and/or intentional actions and omissions of the Defendants, Mr. Hill's condition worsened, he suffered great physical pain and mental anguish, and he died.   Mr. Hill's worsening condition, great physical pain and mental anguish, and death constitute constitutional injuries.

80.     As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, deliberately indifferent, and/or intentional actions and omissions of the Defendants, the

surviving beneficiaries of Mr. Hill have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their loved one, as well as economic losses, and have incurred hospital, doctors', and related bills, as well as funeral expenses.

(The following counts are asserted cumulatively, or in the alternative, individually.)

## COUNT I

### State Law Claims – Wrongful Death *(and, In the Alternative, Survival Claim)*

### Gross Negligence and Willful and Wanton Negligence

**(Against Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara (possibly Sgt. O'Roark); Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5)**

81.     Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.  Plaintiff asserts her survival claim *in the alternative* to Plaintiff's wrongful death claim.

82.     Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara (possibly Sgt. O'Roark); Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5 (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Mr. Hill.

83.     The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Mr. Hill so as to constitute an utter disregard of prudence, amounting to a complete neglect for Mr. Hill's safety. Additionally, the several acts of negligence of each of the Foregoing Defendants, when combined, had the cumulative effect of showing a reckless or total disregard for Mr. Hill.

84.     The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard to Mr.

36

Hill's rights. In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Mr. Hill when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Mr. Hill.

85.     As a direct and proximate result of the gross negligence and/or willful and wanton negligence of the Foregoing Defendants, Mr. Hill died.

86.     As a direct and proximate cause of the gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of the death herein complained of, Mr. Hill suffered great physical pain, and mental anguish.

87.     As a direct and proximate cause of the gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of Mr. Hill's injuries and death, and pursuant to Code of Virginia § 8.01-50, et seq., the Statutory Beneficiaries have sustained damages, including, but not limited to:

    a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

    b)     Loss of services, protection, care, and assistance provided by the decedent.

88.     As a direct and proximate cause of the gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of Mr. Hill's injuries and death, and pursuant to Code of Virginia § 8.01-50, et seq., the Estate of Mr. Hill sustained damages, including, but not limited to:

    a)     Expenses for the care, treatment, and hospitalization of the decedent incidental to the injury resulting in death; and

    b)     Reasonable funeral expenses.

## COUNT II

**State Law Claims – Wrongful Death *(and, In the Alternative, Survival Claim)***

**Negligence, Gross Negligence, and Willful and Wanton Negligence**

**(Against Defendants NaphCare; Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and NaphCare John Doe Defendants 1-5)**

89.     Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.  Plaintiff asserts her survival claim *in the alternative* to Plaintiff's wrongful death claim.

90.     Defendants NaphCare; Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; and NaphCare John Doe Defendants 1-5 (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Mr. Hill.

91.     The Foregoing Defendants owed duties to Mr. Hill to treat him in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment.

92.     The Foregoing Defendants' conduct, as described throughout this Complaint, constituted negligence.

93.     The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Mr. Hill so as to constitute an utter disregard of prudence, amounting to a complete neglect for Mr. Hill's safety.  Additionally, the several acts of negligence of each of the Foregoing Defendants, when combined, had the cumulative effect of showing a reckless or total disregard for Mr. Hill.

94.     The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard to Mr. Hill's rights.  In addition, the Foregoing Defendants acted, or failed to act, in the manner described

throughout this Complaint, with a reckless indifference to the consequences to Mr. Hill when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Mr. Hill.

95.     As a direct and proximate result of the negligence, gross negligence, and/or willful and wanton negligence of the Foregoing Defendants, Mr. Hill died.

96.     As a direct and proximate cause of the negligence, gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of the death herein complained of, Mr. Hill suffered great physical pain, and mental anguish.

97.     As a direct and proximate cause of the negligence, gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of Mr. Hill's injuries and death, and pursuant to Code of Virginia § 8.01-50, <u>et seq.</u>, the Statutory Beneficiaries have sustained damages, including, but not limited to:

a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b)     Loss of services, protection, care, and assistance provided by the decedent.

98.     As a direct and proximate cause of the negligence, gross negligence and/or willful and wanton negligence of the Foregoing Defendants, which contributed to and were the proximate cause of Mr. Hill's injuries and death, and pursuant to Code of Virginia § 8.01-50, <u>et seq.</u>, the Estate of Mr. Hill sustained damages, including, but not limited to:

a)     Expenses for the care, treatment, and hospitalization of the decedent incidental to the injury resulting in death; and

b)     Reasonable funeral expenses.

## COUNT III

### Deprivation of Civil Rights – 42 U.S.C. § 1983

### (Denial, Delay, and Withholding of Medical Care)

### (Against Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; NaphCare John Doe Defendants 1-5; C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5)

99.     Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

100.     At all times relevant to the allegations in this Complaint, Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; NaphCare John Doe Defendants 1-5; C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark); Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5; (collectively referred to *in this Count* as the "Foregoing Defendants") acted or failed to act under color of state law.

101.     The Fourteenth Amendment to the U.S. Constitution provides to pretrial detainees the right to receive treatment for serious medical needs.

102.     As described in the Complaint, the Foregoing Defendants failed to provide necessary medical care, and/or access to medical care, to include timely and proper diagnosis and treatment for his benzodiazepine withdrawal and timely and proper emergency care when his condition required it.

103.     The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mr. Hill's health and safety, especially in light of his documented daily Xanax use and his clear and obvious symptoms of medical distress discussed herein, thereby placing Mr. Hill in substantial risk of severe injury and death.

104.    At numerous times throughout the course of his detention, the Foregoing

Defendants had actual or constructive knowledge that Mr. Hill was in jeopardy of, or

experiencing, benzodiazepine withdrawal, including life threatening complications of

benzodiazepine withdrawal, and that by their failure to respond to such, including their failure to

call EMS timely, his constitutional rights were being violated.

105.    The acts or omissions of the Foregoing Defendants were conducted within the

scope of their official duties and employment.

106.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill

was injured in various respects, including, without limitation, suffering physical injuries and

severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all

attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth

Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

107.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill

died. Mr. Hill's death constitutes a deprivation of his constitutional rights guaranteed by the

Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

108.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful,

wanton, reckless, and conscious disregard of Mr. Hill's rights, by reason of which Plaintiff is

entitled to recover punitive damages.

109.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S.

Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs to the

Estate.

## COUNT IV

**Deprivation of Civil Rights – 42 U.S.C. § 1983**

**(Conditions of Detention)**

**(Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5)**

110. Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

111. At all times relevant to the allegations in this Complaint, Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5 (collectively referred to *in this Count* as the "Foregoing Defendants") acted or failed to act under color of state law.

112. The Fourteenth Amendment to the U.S. Constitution provides to pretrial detainees at least the right afforded under the Eighth Amendment to be free from cruel and unusual punishment. Indeed, a pretrial detainee may not be punished.

113. The Fourteenth Amendment includes the right to be free from extreme deprivations of minimal civilized necessities.

114. As described in this Complaint, the Foregoing Defendants subjected Mr. Hill to conditions creating an extreme deprivation of minimal civilized necessities by tightly strapping him into an Emergency Restraint Chair without any regard for Mr. Hill's safety, and against medical advice that he needed to be immediately transported to a hospital.

115. In particular, the Foregoing Defendants subjected Mr. Hill to harsh and inhumane conditions, by strapping him into a restraint chair for a prolonged period of time with no medical supervision. The Foregoing Defendants' actions included imposing harmful conditions as a direct response to behavior that was a manifestation of Mr. Hill's emergent medical condition.

In turn, the harmful conditions that the Foregoing Defendants perpetrated exacerbated these same emergent medical conditions and caused irreparable harm to Mr. Hill.

116.    Moreover, the Foregoing Defendants denied Mr. Hill access to necessary medical care.

117.    The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Mr. Hill's health and safety, in light of the express warning by healthcare providers that Mr. Hill would die if he were not emergently treated at a hospital, placing Mr. Hill in substantial risk of serious harm.

118.    The Foregoing Defendants were informed by healthcare providers that the conditions of Mr. Hill's confinement were extreme and causing Mr. Hill permanent harm (indeed, that he "would die" if such conditions were not corrected by immediate, emergent care at a hospital); accordingly, the Foregoing Defendants also had actual or constructive knowledge that Mr. Hill's constitutional rights were being violated.

119.    The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

120.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

121.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill died. Mr. Hill's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

122.    The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Hill's rights, by reason of which Plaintiff is entitled to recover punitive damages.

123.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

## COUNT V

## Deprivation of Civil Rights – 42 U.S.C. § 1983

## (Physical Abuse /Excessive Force)

**(Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark); Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5)**

124.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

125.    The Fourteenth Amendment to the U.S. Constitution provides the right to be free of physical abuse and excessive force.

126.    As set forth in this Complaint, Defendants C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5 (collectively referred to *in this Count* as "the Foregoing Defendants") physically abused and/or used unreasonably excessive force against Mr. Hill.

127.    Through their actions and omissions set forth in the Complaint, and while acting under color of state law, and in their individual capacities, the Foregoing Defendants acted in a manner that was deliberately indifferent to Mr. Hill's Fourteenth Amendment rights.

128.    The Foregoing Defendants' use of force against Mr. Hill was  objectively

unreasonable.

129.    The Foregoing Defendants' physical abuse and use of excessive force on Mr. Hill involved reckless and callous disregard for Hill's Constitutional rights.

130.    The Foregoing Defendants engaged in the injurious conduct described in the Complaint with wantonness by applying force maliciously for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline, particularly in light of Mr. Hill's severe and emergent medical state.

131.    The Foregoing Defendants' acts and omissions were conducted within the scope of their duties and employment and under color of state law.

132.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of Mr. Hill's constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

133.    As a direct and proximate result of the Foregoing Defendants' conduct, Mr. Hill died. Mr. Hill's death constitutes a deprivation of his constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

134.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Hill's rights, by reason of which Plaintiff is entitled to recover punitive damages.

135.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs to the

Estate.

## COUNT VI

### Deprivation of Civil Rights – 42 U.S.C. § 1983

**(Against Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green; NaphCare John Doe Defendants 1-5; C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt. O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5)**

136.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set

forth herein.

137.    Through their actions and inactions as described throughout this Complaint,

Defendants Emran, MD; Pierce, RN; Patterson, RN; Pascal, RN, BSN; Daniels, LPN; Green;

NaphCare John Doe Defendants 1-5; C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sgt.

O'Rara Also Known As Sgt. O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe

Defendants 1-5 (collectively referred to *in this Count* as "the Foregoing Defendants"), while

acting under color of state law, acted in a manner which was recklessly and callously indifferent

to Mr. Hill's Fourteenth Amendment rights, including the right to a minimum level of

appropriate medical treatment for a well-documented risk of benzodiazepine withdrawal and

related complications.  The Foregoing Defendants ignored Mr. Hill's obvious and serious

medical needs and/or exigent need for relevant action, and callously failed to provide access to

adequate care to, and/or take appropriate action for, Mr. Hill in violation of Mr. Hill's rights

under the Fourteenth Amendment of the U.S. Constitution.  Through their actions, the Foregoing

Defendants violated Mr. Hill's constitutional rights by showing deliberate indifference to his

medical needs and/or circumstances, and causing him severe physical suffering and his wrongful

death.  The Foregoing Defendants violated Mr. Hill's constitutional rights (secured by the

Constitution and laws of the United States) by the actions and inactions described in the

Complaint, including, among other things, acting or failing to act with deliberate indifference;

failing to provide or provide access, to adequate and appropriate treatment to address Mr. Hill's

serious medical needs; violating the dictates of Section 53.1-126 of the Code of Virginia, which

states that, with regard to detainees/inmates, "…medical treatment shall not be withheld for any

… serious medical needs, or life threatening conditions"; and/or otherwise failing to take

appropriate action.

138.    The Foregoing Defendants' acts and omissions evidence a deliberate indifference

to Mr. Hill's circumstances, including, but not limited to, Mr. Hill's need for medical care.

139.    As a result of the Foregoing Defendants' unconstitutional, deliberate indifference

to Mr. Hill's circumstances, pleas for help and medical needs, Mr. Hill suffered a denial of his

constitutional rights and severe physical pain and suffering.  The Foregoing Defendants'

unconstitutional, deliberate indifference to Mr. Hill's medical needs and circumstances caused

Mr. Hill great pain and suffering and his untimely death.

140.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful,

wanton, reckless, and conscious disregard of Mr. Hill's rights, by reason of which Plaintiff is

entitled to recover punitive damages.

141.    The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S.

Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief

consisting of compensatory damages and punitive damages, attorney's fees and costs to the

Estate.

## COUNT VII

**Deprivation of Civil Rights – 42 U.S.C. § 1983**

**(Deliberate Indifference - Supervisory Liability)**

**(Defendants C.T. Woody, Jr.; Captain Johnson; Lt. Felix; and
Sgt. O'Rara Also Known As Sgt. O'Roark)**

142.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

143.    Through her actions and omissions set forth above, in addition to the foregoing causes of action, *or in the alternative*, and while acting under color of state law, and in their individual capacity, Defendants C.T. Woody, Jr.; Captain Johnson; Lt. Felix; and Sgt. O'Rara Also Known As Sgt. O'Roark (collectively referred to *in this Count* as "the Foregoing Defendants") acted in a manner that was deliberately indifferent to Mitchell's Fourteenth Amendment rights.

144.    As delineated herein, the Foregoing Defendants had actual or constructive knowledge that their subordinates, including Deputy McCloud; Deputy Everett; and the Deputy John Doe Defendants 1-5, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Mr. Hill.

145.    The Foregoing Defendants' responses to that knowledge were so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices.

146.    There was an affirmative causal link between the Foregoing Defendants' inaction and the particular constitutional injury suffered by Mr. Hill.  Specifically, as a result of the the Foregoing Defendants' unconstitutional, deliberate indifference to the needs, circumstances, and requirements of Mr. Hill, Mr. Hill was placed in a restraint chair rather than being emergently transported to the hospital.  He thereby suffered a denial of his constitutional rights and severe

physical pain and suffering.  The Foregoing Defendants' unconstitutional, deliberate indifference to Mr. Hill's circumstances caused his untimely death.

147.     The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Mr. Hill's rights, by reason of which Plaintiff is entitled to recover punitive damages.

148.     The Foregoing Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against each of the Defendants, specifically, Defendants NaphCare, Inc.; Khairul Emran, MD; Donna Pierce, RN; Angela Patterson, RN; Marcella Pascal, RN, BSN; Beverly Daniels, LPN; Kelsey Green; NaphCare John Doe Defendants 1-5; C.T. Woody, Jr.; Captain Johnson; Deputy McCloud; Sergeant O'Rara Also Known As Sergeant O'Roark; Lt. Felix; Deputy Everett; and Deputy John Doe Defendants 1-5; jointly and severally, in the amount of $15 million ($15,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest,  attorney's fees, punitive damages in the amount of $5 million ($5,000,000.00) for the federal claims asserted herein and $350,000 in connection with the state claims asserted herein, and grant such other and further relief that the Court may deem  appropriate.

**TRIAL BY JURY IS DEMANDED.**

BRENDA L. HILL MYRICK,
ADMINISTRATOR OF THE ESTATE OF
GREGORY HILL ALSO KNOWN AS GREGORY
LEE HILL, Deceased,


By:      /s/ Mark J. Krudys
_____
           Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: mkrudys@krudys.com
Web:   www.krudys.com

*Counsel for Plaintiff Brenda L. Hill Myrick, Administrator of the Estate of Gregory Hill, Also Known As Gregory Lee Hill, Deceased*